(No. 30374.—
CHICAGO, WILMINGTON & FRANKLIN COAL COMPANY, Defendant in Error, *vs.* THE INDUSTRIAL COMMISSION *et al.*—(MARGARETT MUTCHEK *et al.*, Plaintiffs in Error.)

*Opinion filed March 18, 1948—Rehearing denied May 13, 1948.*

M. J. HANAGAN, of West Frankfort, for plaintiffs in error.

WILLIAMS & HARRISON, of Benton, for defendant in error.

Mr. CHIEF JUSTICE MURPHY delivered the opinion of the court:

On December 2, 1942, John Mutchek, while engaged in his employment as a coal miner for the Chicago, Wilmington and Franklin Coal Company suffered an injury to the tip of his left index finger. Infection developed in the injured area and to check the spread of such condition the finger was amputated at the first joint and later the entire finger was removed. After a period of healing and recuperation, Mutchek returned to work on June 7, 1943. On August 11, he became ill, and had a high temperature accompanied by chills. A local doctor was called and gave him medical care until he was removed to the Cairo Tuberculosis Sanitarium on September 29, 1943. He died at said institution October 10 following, of pulmonary tuberculosis. The widow on her own behalf, and for the benefit of deceased's dependent children, applied for compensation. The arbitrator made an award and the commission, after hearing additional evidence, sustained it. On *certiorari* the circuit court of Franklin County set the award aside. Petition for leave to review by writ of error was allowed.

The controverted question before the arbitrator and commission was as to whether there was a causal connection

between the injury of December 2, 1942, and the death. The commission having found there was such a connection and fixed an award thereon, the question before the circuit court on *certiorari* was as to whether the finding of the commission was supported by the evidence. The same question is presented on this review.

The judgment of the circuit court vacating the award will have to be set aside and in making a statement to support such conclusion, we will restrict it to such part of the evidence as will demonstrate that the finding of the commission was based on conflicting evidence, and that there is sufficient evidence to sustain the commission's finding.

The injured finger was treated by a physician on the day of the accident, but infection developed immediately thereafter. The doctor in charge testified as to the possibility that the infection came from an old abrasion near the seat of the injury. Between the date of the injury and December 15 following, the doctor treated the finger on eight different days. On the latter date, he opened the wound to give it better drainage. Within the succeeding thirty days, other drainage incisions were made and the finger was amputated at the first joint, and finally on February 11; 1943, the entire finger was removed. The physician in charge testified that at the time of the complete amputation, a sloughed tendon had developed in the infected area, and that the conditions were such as to warrant amputation. Mutchek was hospitalized from February 10 to February 18. Thereafter the infection ceased to spread but the wound continued to drain, discharging a substance which medical experts designated as a "weeping process." The doctor directed discontinuance of the bandage on March 19, but Mrs. Mutchek testified that she bandaged her husband's hand daily for some time after said date. Thomas Newton, a colaborer, who worked with Mutchek in the mines, testified that after he returned

to work in June, the hand was bandaged and continued to be so until near the time of his last illness. Whatever care was given the hand after March 19 was administered at home and without the direction or advice of the doctor.

After returning to his employment, and on July 17, Mutchek interviewed his family physician, Dr. C. H. Williams, who was also the company doctor. The doctor testified that at that time he complained of pain in the stump of the finger, but it does not appear that any treatment was administered for the same. The finger was healed and the doctor said that there was no pus present. Of the fifty days which the mine operated following June 7, Mutchek worked forty-six of them. His last day of employment was August 10, 1943. The next day, Dr. Williams was called to the Mutchek home. He testified that the patient had a pronounced pleural rub over the left lower lobe, which he stated was probably caused by an "acute infection of the lung of some nature." On August 17, the patient was sent to the hospital for X-ray examination. The ones taken on that date showed a generalized mottling of both lungs with some increase in the left lower lobe. The X rays taken thirteen days later showed much the same condition, except that the process in the left lower lobe had increased in density. Others taken September 7, 14 and 22 showed that the involved lung area was rapidly becoming more dense and extending over a greater area. A sputum test, dated September 18, was positive for tubercle bacilli. On September 19, the chest was punctured but no fluid was found. Dr. Williams testified the onset began as an acute lung infection on August 11, when he had his chills and high temperature. He was asked if that was from tuberculosis or some other cause. His answer was "it could have been some other cause, or it could have been tuberculosis pneumonia. We don't know." Mutchek was admitted to the Cairo Tuberculosis Sanitarium September 29 and an X ray taken on

that date showed shadows, which the expert read as suggesting a large cavity in the apex of the right lung with diminished density extending downward toward the center, which it was said indicated an infiltration gradually working downward; that there was also a further infiltration of a lesser nature in the lower part of the right lung, that in the left lung there was a shadow of lesser importance than on the right, without any direct evidence of cavities at the base of that lung. The major involvement was in the right lung. Sputum test revealed tubercle bacilli. The evidence all indicates that the immediate cause of death was pulmonary tuberculosis.

The hypothetical question on which the medical experts based their opinions embodied the evidence showing the nature and extent of the injury, the infection and the medical means taken to check its spread, and other facts developed in the course of the examination. Four medical experts testified on behalf of the company, one of them being Dr. Williams, who treated Mutchek. Two medical experts expressed opinion as to the causal connection on behalf of the claimants. The experts agreed that infection followed by systemic toxemia may, under certain circumstances, reduce the vitality of the patient thereby making him more susceptible to the ravages of germs latent in the body. They are also in fair accord on the general proposition that most adults carry latent tubercle bacilli which may, when resistance is lowered, become activated producing tuberculosis. There is a conflict of views as to the effect the infection had on Mutchek's general condition. Those who testified for the company were of the opinion that the infection was so localized around the injured area that it could not have produced systemic toxemia sufficient to have lowered the patient's resistance. It appears to have been their view that the tubercle bacilli flared into action on or near the time that Mutchek quit work August 10. They attach significance to the length of time that elapsed

between the date the infection was checked, which they fixed in March, and the last illness starting in August. The medical experts testifying for claimants were of the view that the measures taken to check the infection and its general course indicated it was of sufficient seriousness to produce systemic toxemia, that it caused a lowered resistance and thus furnished the condition where the tubercle bacilli could become active. Another point on which they differ from the company's experts was the time when the tubercle bacilli may have become active. It was their view that there was strong probability that the bacilli had been active for weeks prior to August 11 when Mutchek was seized with chills and fever. One of the claimants' experts suggested that Mutchek might have developed an embolism caused by the wound which created the tubercular condition. One of the company's experts called in rebuttal, testified that in view of the condition revealed by the X rays the possibility of an embolism could not be sustained.

The burden was on claimants to prove by direct and positive evidence, or by evidence from which an inference could be fairly and reasonably drawn, that the death of John Mutchek arose out of and in the course of his employment. On the theory of recovery relied upon, it was necessary for them to prove that the injury of December 2, which it was admitted arose out of and in the course of employment, had a direct causal connection with the death. As noted, there was evidence, if adopted as true, which supported the inference that the infection of the finger which followed the injury produced a condition from which the latent tubercule bacilli could become active and develop into tuberculosis.

It was the province of the Industrial Commission to draw reasonable conclusions and inferences from the facts, and the courts are not privileged to set aside a factual finding unless such finding has no substantial foundation in the evidence or is against the manifest weight of the

evidence. (*Cruthis* v. *Industrial Com.* 394 Ill. 506; *Turner* v. *Industrial Com.* 393 Ill. 528; *Lawrence* v. *Industrial Com.* 391 Ill. 80.) Where, as here, the finding of the commission depends upon the adoption of one of two highly conflicting views of medical experts, this court will not undertake to decide which of the two groups is more worthy of belief and whose evidence is entitled to the greater weight. The determination of where the preponderance lies is pre-eminently a function of the commission. (*Buda Co.* v. *Industrial Com.* 377 Ill. 215; *Hansell-Elcock Co.* v. *Industrial Com.* 376 Ill. 151.) Since the evidence is merely conflicting and the commission's finding is not against the manifest weight of the evidence, its decision and order should not have been disturbed.

The judgment of the circuit court is reversed and the award of the commission is confirmed.

*Judgment reversed; award confirmed.*